# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

LESLIE AKERS, and         )
MARY AKERS, his wife,      )
                             )
      Counterclaim Defendants,    )
                             )
      v.                       )        No. 4:13-cv-00794-DGK
                             )
AUTO-OWNERS (MUTUAL)    )
INSURANCE COMPANY,      )
                             )
      Counterclaim Plaintiff.      )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case concerns insurance coverage for a fire which occurred at Leslie and Mary Akers' (collectively "the Akers") home. The Akers initiated this lawsuit, alleging that Defendant Auto-Owners (Mutual) Insurance Company ("Auto-Owners") vexatiously failed to pay all amounts due under their homeowner's policy. Auto-Owners denied the allegations, noting that it had paid more than $3.5 million under the Policy.

During discovery, Auto-Owners discovered evidence that the Akers prepared fraudulent invoices to inflate their losses. Auto-Owners filed a one-count counterclaim alleging that the Akers' conduct violated the policy's anti-fraud provision. Auto-Owners seeks a declaration that the Policy is void and that Auto-Owners is entitled to reimbursement of all amounts paid out under the Policy, as well as its attorneys' fees and costs incurred in defending this lawsuit. The Akers dismissed their claim with prejudice, but Auto-Owners is still pursuing its counterclaim.

On May 13, 2015, the Court held a bench trial. After carefully considering all of the evidence, the Court finds and declares that the Akers violated the Policy's "Concealment or Fraud" provision by misrepresenting material facts, engaging in fraudulent conduct, and making

false statements. As a result, the entire Policy is void and Auto-Owners is entitled to reimbursement of all sums—$3,929,887.40—paid under the Policy. The Court also orders the Akers to reimburse Auto-Owners $146,919.21 for its reasonable costs, expenses, and attorneys' fees incurred in defending against the Akers' claims in this case.

The Court enters judgment in favor of Auto Owners Insurance Company and against Leslie and Mary Akers, jointly and severally, in the amount of $4,076,806.61.

### Findings of Fact

In determining the facts, the Court has carefully considered all of the record evidence, including the parties' stipulations and exhibits and witness testimony. Four witnesses testified in person: Auto-Owners' field claim representative Candice Sartin, forensic accountant Peter J. Karutz, C.P.A., Leslie Akers, and Mary Akers. Nine witnesses appeared via videotaped depositions: Akers' family members Amy Whiting, Laura Whiting, and Randy Akers, and present and former Akers' employees Brian Tripp, Edward Kalleck, Ron German, Bruce Parker, Levi Sherman, and Michael Stone.

In determining how much weight to give each witnesses' testimony, the Court made the following credibility determinations. The Court found Peter Karutz, Candice Sartin, Peter Karutz, Brian Tripp, Edward Kalleck, Ron German, Bruce Parker, Levi Sherman, and Michael Stone to be very credible and believes all, or nearly all, of their testimony. The Court gave greater weight to their testimony because it was consistent with the testimony of the other credible witnesses and the exhibits, and these witnesses had little or no motivation to testify falsely. Indeed, portions of Tripp, Kalleck, German, Parker, Sherman, and Stone's testimony were candid admissions against interest.

The Court found Amy Whiting, Laura Whiting, and Randy Akers to be somewhat credible. Amy Whiting was not credible to the extent she claimed that she did not remember certain things, such as whose idea it was to incorporate AL&H Construction ("AL&H"). Given her testimony and the testimony of others concerning her role in organizing and incorporation AL&H and in issuing checks for AL&H based on invoices Leslie Akers gave her, the Court suspects she minimized her knowledge of certain events, such as whether the invoices Leslie Akers gave her were fraudulent, in an attempt to shield her mother, Mary Akers, and step father, Leslie Akers, from civil and criminal liability. The testimony of Amy Whiting's sister, Laura Whiting, that she had no involvement with AL&H is not credible to the extent it conflicts with the testimony of her mother and step father that she had some involvement in the administration of their business affairs. The Court finds much of Randy Akers' testimony not credible. He acknowledged little more than what bank records and invoices conclusively proved and so could not be denied. His testimony appeared to be designed to protect his brother Leslie as much as he could without implicating himself. Accordingly, the Court gives credence to his testimony only to the extent it is corroborated by other, trustworthy evidence.

The Court finds Leslie Akers and Mary Akers' testimony not credible at all. Their testimony was inconsistent with the mountain of bank records presented and the testimony of the other credible witnesses. The Akers' testimony also contradicted sworn testimony they had given in their depositions on multiple salient points. When counsel for Auto-Owners confronted each of the Akers with this fact, they did not seem to care or be disturbed. Leslie Akers also appears to have attempted to influence some of the other witnesses' deposition testimony. Ron German and Edward Kalleck testified that shortly before their depositions, Leslie Akers attempted to contact them and encourage them to testify more favorably towards him. This

weighs against Leslie Akers' credibility. Finally, and most importantly, the Court notes that when questioned by Auto-Owners' counsel on several crucial topics in this case—such as whether they knowingly submitted false invoices to Auto-Owners—the Akers declined to answer, invoking their Fifth Amendment right not to testify. The Court draws adverse inferences from these invocations. The Court finds that if the Akers had answered these questions truthfully, their answers would have confirmed that they conspired to submit false invoices to Auto-Owners and defraud it of millions of dollars.

After carefully reviewing and weighing all of the evidence, the Court finds the facts to be as follows. The Akers built a very large (approximately 20,000 square foot) residence located at 1999 Southwest 2 Highway in Garden City, Missouri. Shortly after they completed construction a fire of undetermined origin occurred on August 8, 2010, severely damaging the house.

At the time, a homeowners policy ("the Policy") issued by Auto-Owners indemnified the Akers in the event of a fire at their home. The Policy provided "dwelling" coverage in the amount of $2,402,500; "other structures" coverage of $480,500; "personal property" coverage of $1,681,750; and "additional living expenses" coverage of $720,750. Ex. 569. It also included an "increased cost" endorsement that provided additional coverage, up to 25% of the dwelling coverage ($600,625), to reflect the current cost to repair or replace the house, and potentially an additional $80,500 to replace other structures on the property. Ex. 569. The Policy also covered up to 5% of the dwelling coverage ($120,125) to replace trees, shrubs, plants, and lawns damage from a fire. *Id.*

The Policy also contained a "Concealment or Fraud" provision that stated:

> This entire policy is void if, whether before, during or after a loss,
> any insured has:

        a.   intentionally concealed or misrepresented any material fact or circumstance;

        b.   engaged in fraudulent conduct; or

        c.   made false statements;

relating to this insurance.

*Id.*

Auto-Owners subsequently made several large payments under the Policy. Under the "dwelling" endorsement, it paid up to the policy limit: $1,712,134.52 to CitiMortgage, the first mortgagee on the property; and $690,365.48 to CBK Properties III, LLC, the second mortgagee on the property. It also paid the Akers $32,000 for debris removal. Exs. 501-1, -3, -5. Under the "other structures" endorsement Auto-Owners paid $4,585 for damage to the pool house. Ex. 501-7. Under the "personal property" endorsement it paid $250,000 to CBK Properties III, LLC and four payments to the Akers totaling $1,150,837.88. Exs. 501-9, -11, -13, -15, -17. Finally, under the "additional living expenses" endorsement, it made numerous payments to the Akers totaling $89,963.87. Exs. 501-19 to 501-70. Auto-Owners' total payments under the Policy were $3,929,887.40.

On October 26, 2012, the Akers, through their attorney, mailed Auto-Owners' field claim representative Candice Sartin ("Sartin") a letter requesting reimbursement of $119,800 that they allegedly paid to Ron German ("German") to reinstall landscaping damaged in the fire. Ex. 503-1. The Akers also claimed they had paid $152,000 to Kalleck Construction and $9,200 to Tripp Electric to repair concrete in the pool deck and replace wire around the pool damaged in the fire. *Id.* The letter stated that the Akers had expended far more than the insured value of the home and asked what documentation Auto-Owners needed from them so they could collect under the

Case 4:13-cv-00794-DGK   Document 132   Filed 06/15/15   Page 5 of 11

"increased cost" endorsement.  *Id.*  Finally, the letter indicated the Akers did not feel they had been "adequately compensated for the fair rental value of their home from the date of the fire through the rebuilding process."  *Id.*

Attached to the letter were fake invoices from "German Landscaping," "Tripp Electrical," and "Kalleck Construction" bearing forged signatures from German, Brian Tripp ("Tripp"), and Eddie Kalleck ("Kalleck").  Exs. 503-3 to 503-5.  Each invoice was addressed to Akers Construction Co., attention Randy Akers.  Also attached to the letter were copies of five cancelled checks drawn on the account of Akers Construction Co., a construction company owned by Randy Akers.  Ex. 503-6.  Two of the checks were made payable to German, each for $68,500; two of the checks were made payable to Kalleck, each for $85,000; and one check was written to Tripp for $9,200.  *Id.*  All of the checks appear to have been endorsed by the appropriate payee.  In fact, German, Tripp, and Kalleck did not own any of the entities referenced in the invoices, nor did they prepare the invoices, nor did they ever received any money from these checks.  The Akers had them endorse blank checks, then filled in the front of the checks, and then deposited these checks directly into the Akers' own bank account.  The letter, invoices, and cancelled checks were all simply part of a scheme to defraud Auto-Owners.

After receiving this letter, Sartin directed an independent appraiser, Robert Todd ("Todd"), to obtain additional information.  Todd contacted the Akers' counsel and requested more information.  In response, counsel for the Akers' sent a letter dated November 16, 2012, to Todd.  In relevant part, the letter stated

> Les Akers brought in the enclosed materials to me this week in substantiation of the expenses incurred in rebuilding the home.  He has expended over $4,000,000.00 in rebuilding the house and it is not yet complete.  He encloses a quote as to the additional cost to finish the house.

> Les and Mary Akers want to get payment under the Auto-Owners'
> policy as soon as possible. They need the money to complete the
> house.

Ex. 504.

Attached to the letter was an estimate dated November 14, 2012, from "Les Akers Construction" signed by Leslie Akers stating that the cost to finish the house would be "$300,000 - $400,000." Ex. 504-2. Also attached was an invoice purportedly from "Akers Construction Co." and signed by Randy Akers. It stated "Akers Construction Co. was contracted to serve as General Contractor to re-build the main house owned by Les and Mary Akers . . . During [the] time Akers Construction Co. served as General Contractor the amount paid out was $4,318,000.00." Ex. 504-3. It also stated the amount now due Akers Construction Co. was $4,318,000.00, and that it was also owed a 20% general contractor fee of $863,600.00, bringing the total amount owed to $5,181,600.00. *Id.*

In support of Akers Construction Co.'s claim, the letter included fifteen invoices sent from AL&H to Akers Construction Co. for subcontracting work allegedly completed on the house. Exs. 504-4 to 504-19. The amounts on the invoices ranged from $20,000.00 to $500,000.00, and all of the invoices were marked "paid" and signed by Randy Akers. At the end of the letter were three pages of photocopied cancelled checks showing the invoices had, in fact, been paid by Randy Akers from an Akers Construction Co. bank account. The checks were made out to "A.L.&H. Construction, LLC," and the endorsement line on the check back had been stamped "For deposit only A.L.&H. Construction, LLC." Exs. 504-20 to 504-22.

Todd subsequently learned that Mary Aker's daughter, Amy Whiting, had formed AL&H after the fire. Auto-Owners then contacted its attorneys.

On January 17, 2013, the Akers' attorney sent another letter to Todd. It stated,

> Dear Rob:
>
> You asked for copies of the bills, and according[ly] I attach copies of bills from Kalleck Constructions and German Landscaping.
>
> The rebuilding of the Akers' house is 'stalled' as they need more funds to complete the construction. Let's resolve this matter.

Ex. 505. Attached to the letter were two one page, hand-written invoices purportedly sent to Randy Akers of Akers Construction Co. from "Eddie Kalleck" of "Kalleck Construction" and "Ron German" of "German Landscaping." The invoices itemized each company's charges. The Kalleck Construction charges totaled $152,000. Ex. 505-2. The German Landscaping charges totaled $119,800. Ex. 505-3.

The above letters were sent by counsel for the Akers with the Akers' authorization and approval.

Auto-Owners did not pay any more under the Policy. On July 11, 2013, the Akers filed suit against Auto-Owners in the Circuit Court of Cass County, Missouri. Auto-Owners removed the case by invoking this Court's diversity jurisdiction. The Akers First Amended Complaint (Doc. 24) accused Auto-Owners of breach of contract and vexatious refusal to pay all amounts due under the Policy.

Auto-Owners hired Peter Karutz ("Karutz"), a forensic accountant with thirty-two years of experience, to conduct an analysis. Karutz reviewed bank statements (including cancelled checks and deposit slips) from Akers Construction Co., AL&H, and the Akers' bank accounts. He also reviewed deposition testimony given by various witnesses in this case, including the Akers. He found that as part of their claim to recover benefits under the Policy, the Akers wrote checks and produced documents for various companies that purportedly rebuilt his home. In fact, the great majority of those checks did nothing more than circulate monies though various

8

accounts until the money came to rest in the Akers' bank account. Specifically, he found that: (1) the Akers' claim that they paid $4,318,000 to repair fire-related damage to their home was fictitious; (2) Akers Construction Co. was never paid the 20% "general contractor" fee; (3) the Akers deposited approximately $3,900,000 into their bank accounts that was drawn on the AL&H bank account; (4) the proposals/invoices alleging that Eddie Kalleck d/b/a Kalleck Construction, Ron German d/b/a German Landscaping, and Brian Tripp d/b/a Tripp Electrical, performed certain work does not represent actual services performed by these individuals; (5) numerous other checks drawn on AL&H's account and purportedly issued to other workers were ultimately deposited into the Akers' bank account; (6) based on all bank accounts, the most the Akers may have spent rebuilding the house was $1,706,393. The Court found his testimony to be very credible and adopts all of the above listed conclusions.

Defendant's Amended Fees and Costs (Doc. 130) filing shows that through trial Auto-Owners incurred attorneys' fees of $52,435.61, taxable costs of $29,830.96, non-taxable costs litigation related travel expenses of $524.43, and non-taxable expert witness fees to Matson Driscoll & Damico, LLP (Karutz's accounting firm) of $64,128.21. These fees and expenses are reasonable and total $146,919.21.

**Conclusions of Law**

**I.      The Akers violated the Policy's "Fraud and Concealment" provision.**

The Court finds and holds that the Akers violated the Policy's "Fraud and Concealment" provision. Missouri law governs this dispute, and under Missouri law where an insurance policy clearly states that a misrepresentation voids coverage under the policy, that provision is enforceable. *Sentry Ins. v. Whitaker*, No. 4:12CV241-HEA, 2013 WL 4548014, at *3 (E.D. Mo. Aug. 28, 2013). The Akers violated the Policy's "Fraud and Concealment" provision in every

9

way possible.  They intentionally concealed, misrepresented material facts, and made false statements concerning the scope of the damage to their house, who was performing the repair work, who the general contractor was, the amount it actually cost to repair the damage, and who was actually receiving the payments for the repairs.  Furthermore, they engaged in fraudulent conduct by creating fraudulent invoices designed to hide who was actually receiving the payments for the repair work.

Consequently, the Akers are barred from all coverage under the Policy.  Additionally, Auto-Owners is entitled to recover all amounts—$3,929,887.40—previously paid under the Policy.  *See Gen. Cas. Ins. Cos. v. Holst Radiator Co.*, 88 F.3d 670, 670-71 (8th Cir. 1996) (observing that under Missouri law the insurer may recover amounts paid to the insured that were paid before the insurer learned the Fraud and Concealment provision had been violated).

## II. The Akers committed fraud and acted in bad-faith in filing suit against Defendant, justifying award Defendant its reasonable attorneys' fees and costs.

"Under Missouri law, a court may award attorneys' fees in a declaratory judgment action where special circumstances exist."  *Allstate Ins. Co. v. Estes*, 118 F. Supp. 2d 968, 974 (E.D. Mo. 2000).  Special circumstances exist where an insured commits fraud.  *Id.* (awarding an insurance company its attorneys' fees and costs where the insured committed fraud in connection with its insurance claim).

In the present case, the Akers' blatant fraud and bad-faith prosecution of Auto-Owners for vexatious refusal to pay is a special circumstance that justifies awarding Auto-Owners its reasonable attorneys' fees and costs incurred in defending against the Akers' claim and prosecuting its counterclaim.  The Court finds Auto-Owners billing submissions to be reasonable.  Therefore, the Court awards Auto-Owners attorneys' fees, costs, and expenses

10

(including taxable and non-taxable costs, and non-taxable expert witness fees) totaling $146,919.21.

## Conclusion

For the reasons explained above, the Court enters judgment in favor of Counterclaim Plaintiff Auto Owners Insurance Company and against Counterclaim Defendants Leslie Akers and Mary Akers, jointly and severally, in the total amount of $4,076,806.61.

**IT IS SO ORDERED.**

Date: June 15, 2015 _____          ____/s/ Greg Kays_____
                                        GREG KAYS, CHIEF JUDGE
                                        UNITED STATES DISTRICT COURT